**Affirmed in Part, Reversed and Rendered in Part, Remanded in Part, and Opinion Filed October 7, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-23-00088-CV**

**MICHAEL COMBS AND**
**MICHAEL COMBS PROPERTIES, LLC, Appellants**
**V.**
**DIANE CREPEAU AND LARI RENINGER, Appellees**

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-19-03038**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Pedersen, III, and Carlyle
Opinion by Justice Partida-Kipness

Appellants Michael Combs (Michael) and Michael Combs Properties, LLC (the LLC) appeal the trial court's June 21, 2021 order granting partial summary judgment and the trial court's October 28, 2022 Modified Final Judgment, both of which were in favor of appellees Diane Crepeau (Diane) and Lari Reninger (Lari). Because we conclude there was legally insufficient evidence to support the damages awarded to Diane and Lari, we reverse and render judgment that Diane and Lari take nothing on their claims against Michael and the LLC for breach of fiduciary duty

and fraud and render judgment for Michael on his counterclaim for breach of fiduciary duty in accordance with the jury's verdict. We remand the case to the trial court for the limited purposes of calculating pre- and post-judgment interest as allowed by law on the award of actual damages to Michael and for entry of judgment consistent with this opinion.

## BACKGROUND

Betty and Ken Combs had four children; Lisa Bowen, appellant Michael Combs, and appellees Diane Crepeau and Lari Reninger. Following Betty's death, Diane and Lari sued Michael for breach of fiduciary duty, fraud, and fraud by non-disclosure in relation to his management of Betty's finances before her death. Michael filed a counterclaim for breach of fiduciary duty against Diane.

## I.     The Plan

In the mid-1990s, as Betty and Ken[1] began dealing with medical issues and approached retirement age, the family started discussing how to meet the medical and living expenses of Betty and Ken in their later years. Through meetings with their parents, attorneys, and financial planners, Michael and Diane developed "the Plan" to prepare for and address the future financial needs of Betty and Ken. The Plan had two overarching goals: maximize Betty's retirement funds before retirement and divest Betty and Ken of the bulk of their assets so they would qualify for Medicaid to cover future medical expenses. Diane and Michael agree they

---

[1] Ken did not work steadily after 1992 and retired in 1995 or 1996. Ken died in October 2016.

implemented the Plan with Betty's help and oversight before and after her retirement in 2006.

## A. Maximize Betty's retirement funds

The first goal was to maximize Betty's retirement funds. Betty worked for the City of Irving as an administrative assistant for more than twenty years. She retired on May 31, 2006, at the age of 72. Betty's employer-backed retirement plan was the Texas Municipal Retirement System (TMRS). For every $1.00 Betty put into her TMRS account, her employer would give her $2.00. Because of the generous 2-to-1 match, Michael and Diane encouraged Betty to put as much money as possible into TMRS before retirement. Betty's TMRS plan provided for monthly payments to Betty beginning thirty days after her retirement date until her death and for a 75% survivor benefit following her death. The survivor benefit provided for monthly payments to the retirement beneficiary for the beneficiary's lifetime.

According to Diane, she, Michael, and their parents discussed using the TMRS survivor benefits to repay anyone who was left with out-of-pocket expenses for their parents' medical care after their parents' deaths. However, Diane does not dispute she, Michael, Betty, and Ken agreed to remove Ken as the beneficiary on the TMRS account and designate Michael as the beneficiary. Diane testified they chose Michael to be the beneficiary because, as the youngest sibling, he would "have the most opportunity to get the most payments back, so that was planned, too, and – part of the plan." Diane took her parents to complete the paperwork in which Ken

disclaimed his interest in Betty's TMRS retirement funds, and Betty designated Michael as the beneficiary of the lifetime retirement benefits upon her death. Betty later designated Michael as the sole beneficiary for the $7,500 supplemental death benefit (SDB). Michael testified he had nothing to do with Betty's designation of him as her sole beneficiary for SDB and that "was all Mom's choice at her retirement, all prior, I guess."

Betty retired on May 31, 2006 and began receiving monthly TMRS payments on June 30, 2006. Michael received no payments under TMRS before Betty's death. Following her death on April 10, 2018, TMRS began paying Michael $1,001.63 per month in survivor benefits. Michael also received the $7,500 SDB.

### B.     Divest Betty and Ken's assets to remain Medicaid-eligible

The Plan's second goal was for Betty and Ken to divest the bulk of their assets so they could remain qualified for Medicaid should they require it. According to Michael, when the asset planning started in 2006, they wanted "to get the money out of Mom's name as quickly as possible." Based on advisor recommendations, Michael formed the LLC to be the recipient of funds from Betty.

One of the first actions Betty took after her retirement was to transfer their house and accompanying land (the Property) to the LLC by Special Warranty Deed on July 1, 2006. After transferring the house to the LLC, Betty and Ken continued to live there and paid rent to Michael through the LLC. Michael testified the lawyers and financial planners told the family they should get the house out of his parents'

names because the house was their biggest asset. However, they advised against putting the house into a trust, and transferring title directly to Michael while Betty and Ken were alive was not a good option because doing so would have had severe tax consequences. Given those options, the family was advised to have Michael "pay for the house, and then have Mom's rental income offset the taxes and expenses of the house."

Michael told the jury the home purchase was done as "an owner finance" for $100,000 at five percent interest for five years. Every month thereafter, Betty paid the LLC rent, and the LLC paid Betty on the $100,000 owner-financed loan. Betty's rent began at $500 per month but increased twice between 2006 and her death in 2018. At the time of her death, rent was $1,200 per month. Michael testified Betty agreed to the rent increases and doing so was part of the Plan: "the whole purpose of her paying rent is so that we can keep their income low for Medicaid." For example, Betty and Ken had already paid off their mortgage when they transferred the Property to the LLC. The rent paid by Betty and Ken to the LLC after the transfer was then used by Michael through the LLC to offset the annual real estate taxes on the Property. Between 2006 and her death, Betty paid $88,600 in rent to the LLC. The evidence also shows the LLC paid Betty $1,887.12 each month for fifty-nine months and $1,887.13 per month for two months on the owner–financed loan, for a total of $115,114.34.

The Plan also called for Betty to make cash gifts to Michael, Diane, and Diane's minor children. Michael testified Diane did most of the legwork to make sure Betty's accounts were transferred into either Diane's or Michael's names as Betty's retirement approached. According to Michael, Betty expected he and Diane to manage Betty and Ken's money "and take care of them in their lifetime" and, after they passed away, to split whatever was left "amongst the children." Between 2006 and 2011, Betty gifted most of her assets to Michael, Diane, and Diane's minor children. Betty initially gifted money only to Michael through the LLC. But in 2009, she began gifting money to Diane and her minor children. Michael and Diane both understood the money gifted by Betty to the LLC, Diane, and Diane's children was to be used for Betty and Ken's care during their lifetime, and that "whatever was left" after Betty's death would be divided among the four siblings. Michael testified Betty communicated those expectations to both him and Diane.

At trial, Diane presented evidence that Betty gifted the LLC $210,000 between May 22, 2006 and August 26, 2013. Those transactions consisted of bank transfers and withdrawals from checks written by Betty to the LLC from her City of Irving Credit Union (CICU) account. Diane maintains the LLC received all $210,000 as cash gifts. In the trial court, Michael argued the LLC did not receive $32,000 of the $210,000 alleged by Diane and Lari but agreed the LLC received $178,000. The evidence shows four separate bank accounts owned by the LLC received Betty's monetary gifts and rent payments. Those accounts were (1) a Chase

Bank checking account ending in 5661 (Chase LLC Checking), (2) a Chase Bank savings account ending in 1514 (Chase LLC Savings), (3) a Bank of America checking account ending in 7230 (BOA LLC Checking), and (4) a Bank of America savings account ending in 8510 (BOA LLC Savings).

Michael testified the "gifts" from Betty were legal gifts and were "the way for us to get Dad qualified for Medicaid. It is a legal gift to me. Technically it's my money [when gifted to me]." But his moral understanding of what the gifts were was different: "Morally, it's Mom and Dad's money, to take care of them, to do whatever they ask." Michael maintains he used Betty's cash gifts to the LLC to pay for Betty's living, travel, and medical expenses and for the upkeep and renovation of the Property during Betty's lifetime. According to Michael, the LLC paid between $253,000 and $257,000 in expenses on behalf of Betty and Ken between July 6, 2006, and February 1, 2018. Financial records presented to the jury by Diane and Michael show those expenses included the following:

- Payments on the owner-financed home loan;

- Annual homeowners' insurance payments;

- Annual real estate taxes on the Property to Irving ISD, the City of Irving, and Dallas County;

- Property taxes on property inherited by Betty in West Virginia (the West Virginia farm);

- Home improvement and renovation costs for a new concrete driveway, electric meter, hot water heater, and roof;

- Periodic credit card payments; and

- Cash gifts from the LLC to Betty

Michael testified the cash gifts to Betty were requested by her to pay for personal expenses including travel costs to visit her twin, Patty, travel costs for a trip with friends following Ken's death, and the purchase of a new vehicle. Michael made those payments from the Chase LLC Checking, BOA LLC Checking, and BOA LLC Savings accounts.

It is undisputed Diane and Diane's minor children received $116,000 in cash gifts from Betty. Diane deposited checks from Betty into a Discover savings account in her own name and did not withdraw any of those funds during Betty's lifetime. By December 31, 2018, the cash gifts had accumulated interest and totaled $127,812.15. Diane did not use any of those funds to pay for Betty's expenses. She did, however, use the funds to pay the attorney's fees incurred in prosecuting the underlying litigation.

Michael and Diane agree Betty remained active and involved in managing her finances and implementing the Plan until shortly before her death. Similarly, the siblings and Betty's twin sister agree Betty remained mentally alert and very involved in her finances until her death. Diane testified Betty would have asked if she had any questions about how Michael or Diane were handling the finances or carrying out the Plan.

## II.   Sibling Disputes Following Betty's Death

Betty died on Tuesday, April 10, 2018. Four days later, Diane called a family meeting for the siblings to meet and discuss what they would need to do with their parents' estates moving forward. Michael testified none of his siblings complained about how he spent the money Betty gave him while she was alive, but that changed at the April 14, 2018 meeting.

According to Diane, Michael immediately told his siblings at the first meeting that he "gets the TMRS" payments moving forward and he had $56,000 in the bank to be distributed among them. Diane did not like Michael's "tone" and believed the TMRS survivor benefits were supposed to be split among the siblings. Diane thought Michael should have had more money saved from Betty's gifts and believed each sibling was entitled to more money than a quarter of the $56,000 Michael said remained for distribution. She also expected Michael to have financial records showing how the money was spent. Michael testified he brought a list of assets to the first meeting but did not bring detailed financial records because it was only a few days after Betty's death. Over the following months, the siblings met three more times to discuss Betty's estate. Diane secretly recorded those meetings.

After the first meeting, Diane went to the CICU and obtained bank statements from Betty's CICU account from the prior seven years.[2] CICU was unable to provide copies of checks written on the account more than seven years before the request

---

[2] Those statements were not offered as evidence at trial.

due to CICU's retention policies. Lari, however, found a bag in Betty's house containing check registers from Betty's CICU account going back to 2009. Diane testified she went through the CICU statements and the check registers, "looked for weird amounts," and listed her findings on a yellow notepad, which she referred to as "the yellow sheet."

On the left side of the sheet, under "Diane," she listed ten check numbers with the amount of each check paid by Betty to Diane and Diane's children, Austin and Katie, between November 2009, and July 2010. Those checks totaled $116,000. On the right side of the sheet, under "Mike," she listed twelve check numbers with the amount of each check and calculated a total amount of $136,000. According to Diane, each check listed under "Mike" was made out to the LLC. The last two checks on the list, check numbers 2578 and 2579, were for $10,000 each and dated September 23, 2015. Diane admitted the bank statements did not show the $20,000 from those checks leaving Betty's CICU account, and she does not know if Michael ever received those checks. At trial, Diane testified she believes $173,000 left Betty's CICU account between 2006 and 2008 but acknowledged only $116,000 of it was attributable to checks written to the LLC. Diane stated she does not know where the other $57,000 went or "who had that money." The yellow sheet also showed Diane's "general calculation of rent that Mom and Dad paid Mike and how much he would have gotten, roughly. And that added up to $95,100." She admitted at trial, however, that they paid less than $95,100 in rent.

Diane provided copies of the yellow sheet to her siblings at their second meeting. She recalled Michael telling the siblings he had $56,000 in the bank and $93,000 in expenses. In her notes from the second meeting, which were written on a second yellow sheet, Diane wrote that Michael told them the expenses included $10,000 in home renovation costs, $23,000 for Betty to purchase a Hyundai, $36,000 in tax payments, and $24,000 cash. From Michael's information and her notes on the first yellow sheet, Diane concluded $137,000[3] should have been in Betty's account at the time of her death and, therefore, Michael failed to account for $82,100.[4] Diane showed her work for those calculations on the second yellow sheet. According to Diane, Michael stated he would search for documentation to address the $82,100 discrepancy.

At the third meeting, Michael provided his siblings with reports from Quicken, which was the financial software he used to manage the LLC accounts and his personal accounts. Diane was not satisfied with those reports because she believed they could be manipulated by Michael. According to Michael, Diane was not "willing to take" the Quicken reports as proof of Betty's remaining assets. Diane, instead, relied on her notes on the yellow sheet. Lisa told the jury Diane "seemed to badger" and attack Michael at the meetings because she wanted documentation of

---

[3] Diane arrived at $137,000 by subtracting Michael's $93,000 in expenses from the $231,000 purportedly paid to the LLC (i.e., $136,000 in check payments listed on the first yellow sheet and $95,100 in rent). This calculation did not account for the $20,000 not withdrawn from the account.

[4] Diane arrived at $82,100 by subtracting $55,000 from $137,000. It is unclear why she subtracted $55,000 rather than the $56,000 Michael contended was left in the account.

the expenses back to 2006. Lisa thought this was unreasonable because even banks do not keep records that far back.

At the final meeting in November 2018, Michael brought a document titled "Combs Family Settlement Agreement" in which he listed Betty's remaining assets and future liabilities and calculated the distribution owed to each sibling from the remaining assets. Specifically, the estate included total assets of $404,908.15 and future liabilities of $24,904.18. The document listed the following assets:

| | |
|---|---|
| The Property's appraised value | $144,000.00[5] |
| Balance of Diane's Discover savings account | $126,000.00 |
| Proceeds from the sale of the West Virginia farm | $ 50,000.00[6] |
| Balance of the LLC's accounts from which the LLC deposited Betty's gifts and paid expenses | $ 56,200.00 |
| Burial policy proceeds | $ 15,000.00 |
| TMRS Supplemental Death Benefit | $ 7,500.00 |
| TMRS Beneficiary payments received to date | $ 5,008.15 |
| Value of one gold coin | $1,200.00 |

The liabilities included $15,000 in estimated 2018 taxes on the sale of the Property, and $9,904.18 in expenses paid by the LLC after Betty died. Those expenses

---

[5] This is also the amount the siblings agreed Lari would pay to buy the Property.

[6] Michael sold the West Virginia farm for $57,500. He listed $50,000 as the value of the proceeds because the LLC paid $7,500 in taxes on the sale.

included purchasing and installing a new HVAC system at the Property, paying Irving ISD and Dallas County property taxes on the Property, paying an out-of-state owner sales fee for the sale of the West Virginia farm, and tax filing fees for Betty's final tax return. Michael calculated each sibling's share of the remaining assets to be $95,000.99. The agreement also provided for future TMRS survivor benefits to be divided equally among the siblings each month[7] and equal distribution of future mineral right payments from the West Virginia farm. Diane would not agree to the terms of the Combs Family Settlement Agreement.

## III.   The Underlying Proceeding

On February 28, 2019, Diane and Lari sued Michael for breach of fiduciary duty. On April 10, 2019, they added the LLC as a defendant. They later added fraud and fraud by nondisclosure claims against Michael. He, in turn, filed counterclaims against Diane for breach of fiduciary duty, fraud, and fraud by nondisclosure.

On June 21, 2021, the trial court granted Diane and Lari's second amended motion for partial summary judgment on breach of fiduciary duty. By granting the motion, the trial court found Michael owed fiduciary duties to his sisters and breached those duties. Diane and Lari's claims for fraud and fraud by non-disclosure and their request for damages for each of their claims proceeded to trial, as did Michael's counterclaims against Diane.

---

[7] By the time of trial, Michael no longer agreed to divide the TMRS survivor benefits between the siblings.

Diane's husband, Betty's twin sister, Patty, and all four siblings testified at trial. The parties' exhibits consisted of more than 5,600 pages, most of which were records pertaining to twelve bank accounts, two credit cards, one of Michael's personal brokerage accounts, and Michael's mortgage payments on a lake house he owned in Granbury, Texas. Through those exhibits, their own testimony, and their counsel's cross-examination of Michael, Diane and Lari advanced their theory that Michael used Betty's money for his personal expenses. They presented demonstrative summaries of financial records to show Michael received $210,000 in gifts and $90,100 in rent from Betty between 2006 and her death. The data included in the summaries was derived from CICU records related to Betty's CICU account, including Betty's check registers, the CICU "member transaction summary," and check copies provided by CICU, bank statements from the four LLC accounts, and Michael's summaries of his and Betty's expenditures between May 30, 2006 and December 31, 2018.

Diane also testified she did not believe Michael purchased the Property from Betty and Ken. Rather, Diane believed Michael used money from Betty to pay off his school loans. She speculated the monthly loan payments of $1,887.12 made to Betty were payments from Michael to repay Betty for the school loans, not the Property. She presented no documentary evidence to show Michael used funds from Betty to pay his school loans. Diane also suggested certain checks listed on Betty's CICU account summary, including one for $67,595.86 dated January 16, 2008, were

additional gifts to Michael. The CICU bank records, however, did not include a copy of the checks discussed, and Diane conceded she had no idea what the $67,595.86 was for or who received those funds.

During his cross-examination of Michael, appellees' counsel accused Michael of using Betty's money to buy his lake house in Granbury, to pay off his student loans, to renovate the lake house, to pay bills related to lake house such as utility bills, and to pay his corporate credit card bills. Counsel also insinuated various cash withdrawals listed by Michael as "cash to Mom" were cash withdrawals for Michael's personal use and never given to Betty. Michael denied those allegations. He also testified he was prepared to distribute Betty's assets evenly between his siblings. He confirmed the proceeds from the sale of the West Virginia farm were being held in a bank account and were ready to be distributed. The same was true for a gold coin left by Ken, the TMRS payments he had received since Betty's death, and the $56,200 remaining from Betty's gifts to the LLC. Michael agreed Diane and Lari's estimated gifts of $210,000 and rent of $90,100 were "close" to the actual amounts the LLC received from Betty. He testified, however, that those numbers did not account for the expenses paid by the LLC for Betty and Ken's expenses between 2006 and 2018.

Michael offered and the trial court admitted bank statements from the Chase Bank LLC Checking and Chase Bank LLC Savings accounts and from a corporate bank account owned by Michael's chiropractic practice (Cizombs Account). Using

those exhibits and the bank statements offered and relied on by Diane and Lari, Michael presented summaries showing the LLC paid between $253,000 and $257,000 in expenses on behalf of Betty and Ken between July 6, 2006, and February 1, 2018. Michael also admitted at trial that he began using the BOA LLC Checking account to pay bills related to the lake house in 2015. Those bills included payments on one of Michael's business credit cards and utility payments for the lake house. However, Michael also told the jury he deposited income from his Airbnb and HomeAway business into that account. The bank records confirmed his testimony. Between December 28, 2015, and December 5, 2018, Michael deposited $27,111.74 in Airbnb and HomeAway rental payments into the BOA LLC Checking account. Between July 1, 2015, and December 26, 2018, Michael withdrew $65,288.82 from the BOA LLC Checking account to pay personal expenses, including personal credit card payments and lake house utility bills. His withdrawals exceeded his deposits by $38,177.08. Transactions between other accounts made up that shortfall. Between January 1, 2011, and January 2, 2018, Michael moved funds between the BOA LLC Savings account and his personal Bank of America checking account ending in 3412 (BOA Personal Checking 3412). The account statements show Michael deposited $147,500 into the BOA LLC Savings account from the BOA Personal Checking 3412 account. During the same time period, he withdrew $105,000 from the BOA LLC Savings account and deposited those funds into the

BOA Personal Checking 3412 account. Between those accounts, Michael's deposits into the BOA LLC Savings account exceeded his withdrawals by $42,500.

No one presented expert testimony to reconcile the financial records admitted into evidence. Diane testified, however, that the forensic accounting she commissioned was inconclusive. She further testified she has "no earthly idea" how much money Betty had or "who it went to" even after spending "hundreds of hours" over four years reviewing "5,000 pages of documents."

At the conclusion of the four-day jury trial, Diane and Lari's counsel asked the jury to find Michael and/or the LLC liable for fraud and fraud by nondisclosure and to award Diane and Lari $1,318,475 in past economic damages and $350,000 in future economic damages. The jury found Michael and/or the LLC committed fraud and fraud by non-disclosure against Diane and Lari.[8] The jury also found $1,300,000 in past economic damages and $262,500 in future economic damages would fairly and reasonably compensate Diane and Lari for their damages resulting from Michael's breach of fiduciary duty and commission of fraud. The jury also found Diane owed a fiduciary duty to Michael and breached that duty but found she did not commit fraud or fraud by nondisclosure. The jury determined Michael suffered past economic damages of $30,000 as a result of Diane's breach of fiduciary duty.

---

[8] Trial began with opening statements on Tuesday, June 28, 2022, and the case was submitted to the jury on Friday, July 1, 2022 at 1:35 p.m. before the Independence Day holiday. The jury returned its verdict two hours later.

On October 28, 2022, the trial court entered a Modified Final Judgment in accordance with the jury's findings. In it, the trial court off-set the jury's $1,300,000 award of past economic damages to Diane and Lari with the $30,000 awarded to Michael on his counterclaim. This left a net award of $1,270,000 in past economic damages, $262,500 in future economic damages, pre-judgment interest, post-judgment interest, and costs in favor of Diane and Lari. The trial court also imposed a constructive trust on the following assets in the possession of Michael and the LLC: Betty and Ken's home, Michael's lake house in Granbury, $172,000 cash, a one-ounce gold coin, and future TMRS payments of $1,001 per month.

The trial court denied Michael and the LLC's post-judgment motions, and they timely appealed the Modified Final Judgment and the prior summary judgment ruling. Diane did not appeal the portion of the Modified Final Judgment awarding $30,000 to Michael on his counterclaim. On appeal, Michael and the LLC challenge the summary judgment on breach of fiduciary duty, the legal and factual sufficiency of the evidence to support the jury's findings of fraud and fraud by nondisclosure, the legal and factual sufficiency of the evidence to support the jury's damages award, and the imposition of the constructive trust. We conclude Diane and Lari presented legally insufficient evidence of damages and therefore, were not entitled to a judgment against Michael or the LLC. Because this conclusion is dispositive, we address only the legal sufficiency challenge to the damages awarded to Diane and Lari.

## STANDARD OF REVIEW

Evidence is legally insufficient when (1) there is a complete absence of evidence of a vital fact in the record, (2) the court is barred from considering the only evidence presented to prove a vital fact, (3) the evidence presented to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In determining whether there is legally sufficient evidence to support a jury's finding, we review the entire record in the light most favorable to the verdict. *Id.* at 807, 822, 827. We credit favorable evidence if a reasonable juror could and disregard contrary evidence unless a reasonable juror could not. *Id*. at 807, 827. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

## ANALYSIS

In their fourth issue, Michael and the LLC challenge the legal sufficiency of the evidence to support the damages awarded to Diane and Lari. They contend Diane and Lari failed to introduce any evidence necessary to properly value the estate's assets or to apportion damages between Diane and Lari. As for the award of future economic damages, Michael and the LLC maintain there is no evidence the TMRS survivor benefits were to be split between the siblings. We agree with these arguments and conclude the judgment in favor of Diane and Lari should be reversed and a take nothing judgment rendered on those claims.

## A. Past economic damages of $1,300,000

Diane and Lari sought only economic damages. Under the common law, both out-of-pocket and benefit-of-the-bargain damages are methods of measuring economic damages caused by fraud or breaches of fiduciary duty. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009) ("Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure."); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) (stating that under the common law, actual damages can be either direct or consequential and that direct damages for misrepresentation may be measured as out-of-pocket or as benefit-of-the-bargain damages); *Everett v. TK–Taito, L.L.C.*, 178 S.W.3d 844, 858 (Tex. App.—Fort Worth 2005, no pet.) (noting "out-of-pocket" and "benefit-of-the-bargain" are the two common law measures of economic damages); *Roustan v. Sanderson*, No. 02-09-00377-CV, 2011 WL 4502265, at *8 (Tex. App.—Fort Worth Sept. 29, 2011, pet. denied) (mem. op.) (noting economic damages and actual damages are measured the same way and courts often use the terms "economic damages" and "actual damages" interchangeably). The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received. *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998); *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636

–20–

(Tex. 2007) (per curiam) (observing that out-of-pocket damages "derive from a restitutionary theory," while benefit-of-the-bargain damages "derive from an expectancy theory").

A jury generally has discretion to award damages within the range of evidence presented at trial. *Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 713 (Tex. 2016); *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 126 (Tex. App.–Houston [1st Dist.] 2011, no pet.). This principle, however, presumes the jury heard competent evidence of a range of damages. *Bigham v. Se. Tex. Env't, LLC*, 458 S.W.3d 650, 670 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

We measure the sufficiency of the evidence against the jury charge to determine whether that evidence supports the existence of damages and the amount awarded. *Sw. Energy Prod. Co.*, 491 S.W.3d at 713; *see Osterberg v. Peca*, 12 S.W.3d 31, 54 (Tex. 2000). In determining whether the jury had a sufficient evidentiary foundation on which to base the damages award, we may review the evidence tending to support the jury's verdict and disregard evidence to the contrary, except when contrary evidence is conclusive. *Sw. Energy Prod. Co.*, 491 S.W.3d at 713 (first citing *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex. 1990); then citing *City of Keller*, 168 S.W.3d at 817); *AMI Ass'n Mgmt., Inc. v. Sprecher*, No. 01-15-00791-CV, 2017 WL 3526762, at *9 (Tex. App.—Houston [1st Dist.] Aug. 17, 2017, no pet.) (mem. op.).

Here, the charge defined "economic damages" as "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss; the term does not include exemplary damages or noneconomic damages." The charge instructed the jury to determine "what sum of money, if any, if paid now in cash, would fairly and reasonably compensate" Diane and Lari "for their damages, if any, that resulted from Michael Combs' breach of fiduciary duty or fraud, if any[.]" Diane, Lari, Michael, and Lisa agree the Plan was to divide Betty's estate evenly between them when Betty died. Diane and Lari sued Michael because they believe he decreased the value of the estate during Betty's lifetime by using Betty's assets to fund his personal expenses and, as a result, improperly decreased their share of the estate. The economic damages sought by Diane and Lari were benefit-of-the-bargain damages measured as the difference between the value of their share of the estate as represented and the value received. Under Diane and Lari's theory of the case, their past economic damages were, therefore, limited to their combined one-half share of what the value of the estate would have been at the time of Betty's death but for Michael's fraud or breaches of fiduciary duty. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 221 (Tex. 2017) (party seeking damages for breach of fiduciary duty must produce evidence of a causal relationship between the fiduciary's action and those damages).

After painstakingly reviewing the appellate record, including the trial transcripts and the more than 5,600 pages of exhibits, we conclude the past economic

damages award cannot stand because there is no evidence of the value of the estate absent Michael's fraud or breaches of fiduciary duty and no evidence from which a reasonable jury could find Diane and Lari's combined one-half share of the estate was valued at $1,300,000.

### 1. Value of Betty's estate

During closing argument, appellees' counsel acknowledged "it is incredibly difficult to figure out how much money Michael got from his mom or had access to" and "[i]t's very difficult to tell how much money he received, and it is incredibly difficult to tell how he used it and for what." Nonetheless, counsel advised the jury that Diane and Lari had shown them "at least some, and I think a lot, of the money with which he was entrusted was used – his mom's money for his own purposes." Counsel told the jury to remember the "multiple credit card statements" showing Michael paid the earnest money and down payment for the lake house and many expenses for the lake house from the same account in which he held Betty's monetary gifts. Counsel also argued Michael did not earn enough money to buy a lake house, pay off his student loans, and pay off the mortgage on his primary residence, so he must have used Betty's money to make those payments. Counsel also told the jury Michael's testimony concerning cash payments to Betty for a car and travel expenses was not credible. Finally, counsel spent time discussing the $67,595.86 check from Betty's CICU account. Counsel acknowledged no one could determine who the check was written out to or for what reason. However, counsel

told the jury the check was likely written for Michael to pay his student loans. Counsel suggested Michael's monthly payments to Betty of $1,887 were not to pay back an owner-financed loan on the Property. Rather, counsel proposed to the jury "that what really happened" was Betty gave the $67,595.86 to Michael to pay off the student loans and then he paid that loan back in monthly increments of $1,887.

At the conclusion of appellees' initial closing argument, counsel asked the jury to hold Michael "responsible for the full amount of the assets that he received and that he cannot account for." Then, at the conclusion of appellees' rebuttal argument, counsel asked the jury to award Diane and Lari $1,318,475 in past economic damages and $350,000 in future economic damages. Counsel quantified the request as follows:

> So whenever we're talking about our damages, we're going to ask for 144,000 for the house, 90,000 for the rent, 210,000 for the cash entrusted to Michael, 1850 for the gold coin,[9] 57,500 for the farm, 20,000 for the bank, 35,000 for Betty's Discover account, 51,000 plus 750 for the -- 7,500 for the TMRS already collected, and 99,000 Michael Combs Properties BOA savings, in addition to the $300,000 lake house[10] because we showed you where the money to buy the lake house came from Betty's money. All the credit card payments that were made for improvements to the lake house came from Betty'[s] money. It was in Michael Combs Properties which he admitted was set up to hold Betty's properties.

---

[9] There is no evidence to support counsel's valuation of the gold coin. Rather, the only evidence of the gold coin's value was a December 24, 2015 appraisal valuing the coin at $1,280. This is just one of many discrepancies between the parties' arguments and the actual evidence presented below.

[10] The 2022 assessed tax value of the lake house was $299,410.

So in total we're asking for $1,318,475. And in future damages, 350,000 that's estimated that he will receive from TMRS going forward.

So those are the answers we want you to put into the questions as to damages, 1,318,475[11] and 350,000.

The jury awarded $1,300,000 in past damages and $262,500 in future damages.

On appeal, Diane and Lari argue the items referenced by counsel during closing argument were supported by legally sufficient evidence and constituted the economic damages they suffered because of Michael's bad acts. The evidence relied on by Diane and Lari, however, was legally insufficient to show the sisters would have been entitled to the value of those assets but for Michael's bad acts.

### a. Assets held for distribution to the siblings

The appraised value of the Property, the proceeds from the sale of the West Virginia farm, the funds remaining[12] from Betty's monetary gifts to the LLC, and the value of the gold coin, undeniably comprised part of the estate's value. However, there was no evidence Michael misappropriated those funds and no evidence Diane and Lari were entitled to the full value of those assets. Michael testified he had continuously held the gold coin, the remaining funds gifted to the LLC from Betty,

---

[11] The categories of damages requested by counsel added up to $1,015,850, not the $1,318,475 requested by counsel.

[12] On appeal, Diane and Lari argue $59,025 remained from the monetary gifts Betty gave to the LLC. This is contrary to Diane and Michael's testimony that Michael told the siblings $56,000 remained from Betty's gifts to the LLC. Their request for $59,025 is also contrary to the bank records presented by Diane and Lari below. Those records show the BOA LLC Savings account had a balance of $49,039.70 on December 31, 2018, and the BOA LLC Checking account had a balance of $58,612.46 on December 31, 2018, which included the $57,500 proceeds from the sale of the West Virginia farm. Further, counsel asserted the BOA LLC Savings count's balance was $99,000, which we discuss separately below.

and the proceeds from the sale of the West Virginia farm for final distribution between the siblings once the litigation concludes. As for the Property, the LLC remained the owner. Since Betty's death, Lari lived in the home rent free and intended to purchase the Property. The Combs Family Settlement Agreement included the anticipated sale of the Property to Lari in its calculations of each sibling's share of the estate, and Michael testified it remained his intent to sell the Property to Lari. Diane and Lari presented no evidence to contradict Michael's testimony or to show they were damaged by Michael holding those assets for distribution at the conclusion of the litigation.

There was no evidence Michael absconded with, spent, or otherwise withheld the proceeds from the sale of the West Virginia farm, the value of Betty's house, the $56,000 remaining from Betty's gifts to the LLC, or the value of the gold coin. On the contrary, the evidence conclusively showed Michael retained those items and monies for equal distribution between the siblings following the conclusion of the underlying proceeding. Diane and Lari's fear Michael would not divide those assets constitutes no evidence that he had retained those assets for himself or to their detriment. *See In re M.G.G.*, No. 05-19-00777-CV, 2020 WL 4581646, at *5 (Tex. App.—Dallas Aug. 10, 2020, no pet.) (mem. op) ("Damages must be ascertainable in some manner other than by mere speculation or conjecture").

Under this record, we conclude there is no evidence to support a finding that Diane and Lari were entitled to the full value of the Property, the gold coin, the farm

proceeds, and the $56,000 remaining from funds gifted to the LLC. The evidence concerning the other categories of damages is similarly deficient.

### b.     Rent payments and monetary gifts to the LLC

Diane and Lari presented two evidentiary summaries showing the LLC received $210,000 in cash gifts and $90,100 in rent payments from Betty. Although Michael disputed the accuracy of those amounts, he conceded they were "close" to the amounts received by the LLC. After thoroughly reviewing the evidence, we have determined neither party's calculation is correct. The evidence shows the LLC's bank accounts received $190,000 of the gift transactions listed by Diane and Lari. It is unknown what account received the remaining $20,000 because records could not be found for those transactions.[13]

As for rent paid to the LLC, the financial records in evidence confirm $88,600 was received by the LLC. According to Diane and Lari's Demonstrative Summary A, it was unknown what account received four checks written on Betty's CICU account; check numbers 1940, 1924, 2473, and 2534. Each check was for $500, which suggests they were rent checks. The financial records admitted at trial did not show which account received $1,000 from check numbers 1940 and 1924. The records confirmed, however, that check number 2473 was received by the BOA LLC Savings account, and Lowe's received the funds from check number 2534. Under

---

[13] These unknown funds are listed on Diane and Lari's Demonstrative Summary B as check numbers 1871, 1879, 1973, 2001, 2006, 2035, and 2042 from Betty's CICU account.

–27–

this record, a reasonable juror could not conclude the LLC received $210,000 in cash gifts or $90,100 in rent from Betty because the financial records controvert those calculations.

Moreover, there is no evidence the LLC wrongfully received the gifts and rent payments from Betty. It is undisputed the Plan required the LLC to receive monetary gifts from Betty, to purchase the Property from Betty and Ken, and to receive rent from them to offset taxes on the Property. Those actions were intended to deplete Betty and Ken's assets so they could maintain Medicaid eligibility. Diane and Lari presented no evidence from which the jury could conclude the receipt of those funds was a result of Michael's fraud or breach of fiduciary duties. They, therefore, failed to establish a right to any portion of those payments, let alone the full value of them, as economic damages caused by Michael's alleged misconduct.

### c. Value of the CD purchased in 2007

Counsel's request during closing argument for an award of the "20,000 for the bank" referred to the value of a certificate of deposit (CD) purchased by the LLC for Betty's benefit in 2007. The evidence was undisputed the CD earned interest of $641.96 and its value at maturity was $20,328.40. The evidence conclusively showed those proceeds were transferred into the BOA LLC Checking account and used only for Betty's expenses. On February 1, 2008, the BOA LLC Checking account had a balance of $21,349.03. The CD's interest was deposited into the account on October 15, 2007, and the maturity value was deposited on February 13,

2008. The account's ending balance on February 29, 2008, was $40,291.27, which reflected the CD deposit, a rent deposit of $500, and one payment of $1,887.12 to Betty. Over the next seven years, monthly rent payments continued to be deposited into the BOA LLC Checking account. Withdrawals from the BOA LLC Checking account between February 1, 2008 and April 30, 2010 were comprised primarily of monthly payments to Betty of $1,887.12, payments to various third parties for Betty's expenses, including payments to O'Connor & Associates to reduce the property tax rate on the Property, tax payments to the City of Irving, Irving ISD, and Dallas County, homeowners' insurance payments on the Property, and transfers to and from the BOA LLC Savings account. The exceptions were three credit card payments in May and June 2009 totaling $1,595.11. Michael's evidence listed two of those credit card payments as payments for expenses related to Betty. The remaining payment of $213.88 was unaccounted for. The BOA LLC Checking account had a balance of $46,532.76 on April 30, 2010.

By May 31, 2010, the account balance was $4,951.19 because checks totaling $2,081.57 were drawn on the account and $40,100 was transferred out of the account. The May 2010 statements of the BOA LLC Checking and BOA LLC Savings accounts show the $40,100 was transferred to the BOA LLC Savings account. The record includes no evidence Michael or the LLC used the CD proceeds to pay personal expenses. The evidence shows only that the funds remained in the BOA LLC Checking and BOA LLC Savings accounts. To say Michael used those

–29–

funds to pay for personal expenses is pure speculation and constitutes no evidence of economic damages caused by Michael's alleged misconduct. *See In re M.G.G.*, 2020 WL 4581646, at \*5.

### d. $35,000 for Betty's Discover Savings account

Betty owned a Discover Savings account[14] to which Michael was listed as a co-owner. According to Michael, he and Betty closed Betty's Discover Savings account in October 2015 after withdrawing the account balance of $35,257.90 for Betty to purchase a new vehicle, a Hyundai Santa Fe. Diane and Lari asked the jury to award them the $35,000 transferred out of Betty's Discover Savings account because they did not believe the money was given to Betty for her personal use. Again, economic damages may not be based on a party's speculation, suspicion, or belief. Diane and Lari's beliefs are, therefore, insufficient to support awarding them those funds. *See In re M.G.G.*, 2020 WL 4581646, at \*5. Moreover, the evidence corroborated Michael's testimony and did not show he used any of those funds for himself.

This money is traceable through the bank statements in evidence. Those records show $20,000 was withdrawn from Betty's Discover Savings account on September 16, 2015. The records next show a $20,000 transfer posted into Michael's BOA Personal Checking 3412 account on September 21, 2015, from a Discover

---

[14] Betty's Discover Savings account number ended in 8929. We refer to that account as Betty's Discover Savings account.

Bank account. Then, on September 23, 2015, Michael withdrew $20,000 cash from his BOA Personal Checking 3412 account. Michael testified he gave Betty that cash to buy a new vehicle. Betty purchased a Hyundai Sante Fe from Freeman Hyundai for $22,843.75 cash in January 2016. Michael's trial exhibits included a cashier's check from Betty's CICU account dated January 4, 2016, for $22,843.75. The cashier's check was made payable to Freeman Hyundai. The Purchase Agreement between Betty and Freeman Hyundai, also in evidence, shows she paid $22,843.75 for a Hyundai Santa Fe without financing. Diane and Lari's speculation and disbelief that Michael gave Betty $20,000 cash to buy the Hyundai constitutes no evidence of economic damages caused by Michael's alleged misconduct. *See In re M.G.G.*, 2020 WL 4581646, at *5.

Records show a similar series of transaction concerning the remaining $15,000 sought by Diane and Lari. On October 1, 2015, Betty's Discover Savings account shows a withdrawal of $15,257.90. That transfer brought the account balance to $0 and the account was closed. On October 6, 2015, a $15,257.90 transfer was posted into Michael's BOA Personal Checking 3412 account from a Discover Bank account. Then, on October 13, 2015, Michael withdrew $15,000 cash from his BOA Personal Checking 3412 account and gave the cash to Betty. According to Michael, he said he did not know why Betty wanted the $15,000 or what she used it for. She asked for the money and he gave it to her.

Diane and Lari presented no documentary proof or non-speculative testimony to contradict Michael's testimony. And none of the financial records in evidence show a $15,000 cash deposit following the October 13, 2015 withdrawal. The only $15,000 transaction after October 13, 2015 occurred on July 6, 2018 when Michael transferred $15,000 from his BOA Personal Savings account ending in 9667 to his BOA Personal Checking 3412 account. The same day, he paid Lisa Bowen $15,000 via a check drawn on his BOA Personal Checking 3412 account. The siblings agreed to pay Lisa that $15,000 because she was the only sibling who had not received any assets from Betty's estate.

Under this record, there is no evidence from which a reasonable jury could find Michael kept the $35,000 from Betty's Discover Savings account for his personal use. Diane and Lari's disbelief and speculation that Michael kept the money for himself constitutes no evidence of economic damages caused by Michael's alleged misconduct. *See In re M.G.G.*, 2020 WL 4581646, at *5.

### e. $99,000 balance of the BOA LLC Savings account

Counsel also asked the jury to award Diane and Lari the "99,000 Michael Combs Properties BOA savings." There is no testimony or documentary evidence showing the BOA LLC Savings account had a $99,000 balance at the time of trial. The bank statements in evidence showed an account balance of $49,029.70 on December 21, 2018. Although those funds could be included in calculating the value of the estate, Diane and Lari would be entitled to, at most, a combined one-half share

of those funds. To the extent the jury's past economic damages included the $99,000 requested by counsel, there is no evidence to support that award.

### f. TMRS survivor benefits and supplemental death benefits (SDB) received by Michael through trial

Appellees' counsel also asked the jury to award Diane and Lari the $51,000 of TMRS survivor benefits Michael had received since Betty's death and the $7,500 of SDB he received as Betty's sole designated beneficiary. There is no evidence, however, to show Diane and Lari were legally entitled to any portion of the TMRS payments. Lari discovered an undated and unsigned letter in Betty's home office, which was titled "Testamentary Letter of Kenneth and Betty Combs" and addressed "Dear Executor of my will[.]" The letter was typed and stated it was intended to supplement Betty and Ken's will and outline their wish to bequeath certain gifts upon their deaths. The letter included seven numbered paragraphs, one of which was blank. The sixth paragraph addressed the TMRS benefit and stated Betty's "TMRS" should "be divided among the remaining siblings" after both parents died.

With exceptions not applicable here, a valid will must be (1) in writing, (2) signed by the testator in person or by another person on behalf of the testator in the testator's presence and under the testator's direction, and (3) attested to by two or more credible witnesses who are at least 14 years of age and who subscribe their names to the will in their own handwriting in the testator's presence. TEX. EST. CODE § 251.051; *Altice v. Hernandez*, 668 S.W.3d 399, 410 (Tex. App.—Houston [1st Dist.] 2022, no pet.). The letter relied on here is typewritten and includes Betty and

Ken's typewritten names at the bottom. However, the letter is not attested to as required by section 251.051. The document, therefore, had no legal effect and constitutes no evidence of Betty and Ken's wishes regarding the TMRS benefits. The only legally sufficient evidence concerning the TMRS benefits was the documentation showing Betty designated Michael the sole beneficiary of the survivor benefits and the SDB. Under this record, the evidence is legally insufficient to support the award of TMRS benefits and SDB payments as past economic damages to Diane and Lari.

### g. $300,000 appraised value of the lake house

Michael purchased a lake house in Granbury, Texas in February 2011. Diane and Lari asked the jury to award them the appraised value of the lake house because "the money to buy the lake house came from Betty's money" and Michael's credit card statements showed he used Betty's money to pay for improvements to the lake house. Diane and Lari focused those arguments on evidence showing Michael paid $34,500 in earnest money and a down payment to purchase the lake house from the BOA LLC Checking account and listed the Property and the West Virginia farm as assets on his loan application. That evidence does not, however, support a finding that doing so deprived the estate of either $300,000, or of the $34,500 in payments for the lake house purchase.

It is undisputed Michael paid Central Texas Title $3,500 earnest money via check on January 25, 2011, and paid Bank of America a $31,000 down payment via

check on February 28, 2011. Those checks were drawn on the BOA LLC Checking account. But Michael insisted the money used for those payments originated in his personal accounts and denied using Betty's money to make those payments. Bank statements confirm funds sufficient to cover the earnest money and down payment originated from Michael's BOA Personal Checking 3412 account and were transferred to the BOA LLC Savings account and the BOA LLC Checking account from which the checks were paid. On January 11, 2011, Michael transferred $13,000 from the BOA Personal Checking 3412 account to the BOA LLC Savings account. On February 28, 2011, a $26,000 transfer deposit posted in the BOA LLC Savings account. That money, like the $13,000 deposit, was transferred from the BOA Personal Checking 3412 account. Then, on February 23, 2011, he transferred $30,000 from the BOA LLC Savings account to the BOA LLC checking account. Both BOA LLC accounts were used to hold monetary gifts from Betty. Michael's transfer of $39,000 in personal funds to those accounts in January and February 2011 exceeded the $34,500 paid for the lake house purchase.

Michael testified he took the money for the earnest money and down payment from his personal account and transferred it into the LLC account because he wanted the lake house in the LLC's name for tax and asset protection purposes. But the mortgage company told him at the closing that the lake house could not be titled to the LLC. He went ahead and paid the down payment out of the BOA LLC Checking account because he had already transferred his personal funds to that account.

Although the jury could have found this explanation unconvincing, the documentary evidence in the bank statements confirms the estate was not deprived of the $34,500 paid for the lake house.

Similarly, listing the Property and the West Virginia farm as assets on a mortgage application does not show Michael deprived the estate of those assets. On the contrary, Michael's uncontroverted testimony confirmed those assets were intact and ready for distribution between the siblings at the conclusion of the litigation. Although the jury may not have believed Michael was required to disclose those assets on his mortgage application because they were in the LLC's name, that credibility determination is relevant to his liability for breach of fiduciary duty and fraud. It is irrelevant to the question of whether he deprived the estate of those assets. Diane and Lari also contend Michael's listing the assets on the mortgage application entitled the jury to determine the lake house "was an asset that Michael was holding on behalf of Betty and his sisters." Diane and Lari provide no legal authorities to support this assertion, and we have found none. Moreover, the lake house was owned and titled to Michael, not the LLC. It is, thus, unrelated to the estate.

Diane and Lari's final argument for why they are entitled to the appraised value of the lake house focused on Michael's commingling of Betty's monetary gifts and his personal funds. It is undisputed Michael commingled personal funds with the BOA LLC Checking account and the BOA LLC Savings account. He admits to paying bills related to the lake house from the BOA LLC Checking account. Bank

–36–

records confirmed Michael began using the BOA LLC Checking account to pay for lake house expenses in July 2015. But the evidence also showed Michael began depositing rental income earned for listing the lake house as an AirBnB and HomeAway property into the same account in December 2015. Our review of the record revealed Michael deposited $27,111.74 of rental income into the account between December 28, 2015, and December 5, 2018, and paid $65,288.82 of lake house expenses out of the account between July 1, 2015 and December 26, 2018. His expenditures from this account exceeded his deposits by $38,177.08. However, that evidence alone did not show Diane and Lari were entitled to any of that money or had any greater right to the money than Michael, much less to the full appraised value of the lake house.

Transactions among the other LLC-owned accounts and undisputed evidence of Michael paying Betty and Ken's expenses between 2006 and 2018 negate the shortfall in the BOA LLC Checking account. For example, between January 1, 2011, and January 2, 2018, Michael deposited personal funds totaling $147,500 into the BOA LLC Savings account. During the same period, Michael withdrew $105,000 from that account and deposited it into a personal checking account. His net deposit of personal funds into the account was $42,500, which exceeds the $38,177.08 shortfall related to lake house expenses.

Similarly, the evidence was undisputed Michael used Betty's monetary gifts to pay Betty and Ken's expenses for twelve years. The exact amount of the

expenditures was not conclusively established by Michael, Diane, or Lari. However, Michael presented demonstrative summaries of financial records itemizing the expenses paid for Betty and Ken between July 6, 2006 and December 31, 2018. According to those summaries, Michael paid between $253,095.61 and $257,907.58 in expenses for Betty and Ken. Diane and Lari presented no documentary evidence to disprove Michael's calculations. Diane and Lari failed to provide the jury with an actual amount of funds Michael took from the estate without reimbursing it or even a range of damages from which the jury could calculate how much Michael diminished the estate, if at all. Although Michael's commingling of funds likely tarnished his credibility in the jury's eyes, there is no evidence he diminished the estate by his actions. There is, therefore, insufficient evidence to support the award of the value of the estate. *See Bigham*, 458 S.W.3d at 667, 671 (legally insufficient evidence of damages for breach of fiduciary duty where plaintiff failed to provide the jury with an actual amount of money "it would have allegedly recovered but for appellants' conduct" and no evidence establishing a range of damages).

### h. Other unknown accounts and transactions

On appeal, Diane and Lari argue they presented evidence of unaccounted for funds from which the jury could conclude Michael lacked credibility and "was entitled to determine, based on its assessment of Michael's credibility, that Michael was not being truthful and had received that money." At trial, they focused mainly on the $67,595.86 mystery check written on Betty's CICU account and their

allegation Betty paid off Michael's student loans with those funds. They maintain the jury "was entitled to be suspicious about Michael's changing testimony about how he paid off $200,000 in student loans in less than 10 years." Diane and Lari also contend there was evidence from which the jury could conclude Michael stole proceeds from investment accounts Betty opened in the 1990s but were closed by 2015. None of these allegations provide legally sufficient evidence to support the award of $1,300,000 in past economic damages because they are based solely on Diane and Lari's unsubstantiated suspicions and opinions. *See In re M.G.G.*, 2020 WL 4581646, at *5.

Further, the evidence controverts those allegations. Diane admitted that no records show who the $67,595.86 mystery check was written to, who received the funds, or what the funds were for. The only reference to the check itself or the amount of the check within the trial exhibits is a general entry on the CICU account's bank summary listing the check number, date, and amount. Moreover, none of the account records in evidence show a deposit of $67,595.86 or otherwise reference that amount or the associated check number. There is no evidence Michael received those funds or used them for personal expenses.

Further, bank records refute Diane and Lari's allegation that Betty gave Michael the $67,595.86 to pay off his student loans. The evidence shows Michael deposited $36,165.43 into his BOA Personal Checking 3412 account between February 12, 2008 and April 22, 2008. He paid off the student loans after making

four student loan payments totaling $38,679.85 from the BOA Personal Checking 3412 account between February 14, 2008 and April 24, 2008. The bank statements do not show where the deposits originated. However, the financial records established the student loan payments were made from Michael's personal funds, the payoff amount was nearly $30,000 less than the amount of the mystery check, and $67,595.86 was not deposited into any of Michael's accounts or any of the LLC's accounts. Diane and Lari's speculation about the mystery check, the student loan payoff, and purported existence of other accounts for which no documentary evidence was presented or admitted at trial constitute no evidence to support the past economic damages awarded here. *See In re M.G.G.*, 2020 WL 4581646, at \*5.

### 2. The past economic damages award exceeds Diane and Lari's combined one-half share of the estate.

Diane, Lari, and Michael all agreed any assets remaining in Betty's estate were to be divided equally among the four siblings. Appellees' counsel, however, asked the jury to award Diane and Lari the entire amount of money paid to the LLC between 2006 and 2018, the full value of property being held in trust by Michael for distribution, and the appraised tax value of the lake house. Counsel asked the jury to hold Michael "responsible for the full amount of the assets that he received and that he cannot account for." As we concluded above, the evidence was legally insufficient to support findings that the estate's value was $1,300,000 or that Michael's alleged breach of fiduciary duty and fraud diminished the estate by

$1,300,000 such that Diane and Lari were damaged in that amount. But even if the evidence supported either of those findings, Diane and Lari would not be entitled to the entire $1,300,000. Rather, any past economic damages would be limited to Diane and Lari's collective one-half share of the total value of the estate. The award is legally unsupportable for that reason as well.

### 3.    Conclusion

After reviewing the entire record in the light most favorable to the verdict, crediting favorable evidence if a reasonable juror could and disregarding contrary evidence unless a reasonable juror could not, we conclude the evidence at trial could not enable reasonable and fair-minded people to find Diane and Lari suffered $1,300,000 in past economic damages. We sustain Michael and LLC's fourth issue as to the award of past economic damages.

### B.    Future economic damages of $262,500

Michael and the LLC also challenge the jury's award of $262,500 in future economic damages, which compensate Diane and Lari for TMRS survivor benefits Michael could receive in his lifetime. Michael testified he had received $1,001 per month in survivor benefits from TMRS since Betty's death. At the time of trial in June 2022, Michael had received more than $51,000 in TMRS survivor benefits. Diane and Lari, however, provided no evidentiary or legal basis to support a finding that Michael's receipt of monthly TMRS survivor benefits caused them damages. As discussed above, it is undisputed Betty named Michael the sole beneficiary of the

–41–

TMRS survivor benefits. The unsigned testamentary letter is not legally binding and constitutes no evidence that Diane and Lari were entitled to a portion of those benefits. Any award of future TMRS benefits to them was, therefore, improper.

Moreover, the amount awarded has no evidentiary support. Appellee's counsel asked the jury to award Diane and Lari $350,000 in future economic damages to compensate Diane and Lari for the TMRS survivor benefits Michael would receive in the future. Appellees' counsel asked for $350,000 because if Michael "lives as long as his dad, he'll collect another $350,000" in TMRS survivor benefits. The jury awarded $262,500, which is three-quarters of $350,000 and appears to represent the sisters' collective share of the estimated future benefits. No competent evidence supports the amount of that award. Rather, the award is based on the unsubstantiated opinion of appellees' counsel that Michael would live as long as Ken and his use of that estimate to calculate the amount of TMRS benefits Michael would earn in his lifetime. Diane and Lari presented no evidence, however, to support that assumed life span. As such, the damages awarded lack both legal and factual support and must be reversed.[15]

---

[15] Counsel's argument also resembles unsubstantiated anchoring, a practice on which claimants cannot rely to sustain a non-economic damages award. *See Gregory v. Chohan*, 670 S.W.3d 546, 557 (Tex. 2023) (plurality op.) ("We understand unsubstantiated anchoring to be a tactic whereby attorneys suggest damages amounts by reference to objects or values with no rational connection to the facts of the case."). Although the Texas Supreme Court has not addressed unsubstantiated anchoring in relation to economic damages, we find counsel's estimate of Michael's life span similarly unreliable to support the future economic damages awarded here.

Because our decision on the issue of damages is dispositive, we do not address appellants' remaining issues. TEX. R. APP. P. 47.1.

**CONCLUSION**

The evidence was legally insufficient to show appellees suffered any economic damages as a result of Michael's breaches of fiduciary duty and fraud. Accordingly, we reverse the portions of the Modified Final Judgment that were in favor of appellees Diane Crepeau and Lari Reninger, including the partial summary judgment that merged into the final judgment,[16] render judgment appellees take nothing on their claims against appellants Michael Combs and Michael Combs Properties, LLC, and render judgment awarding $30,000 for damages incurred in the past to appellee Michael Combs on his counterclaim for breach of fiduciary duty against Diane Crepeau. We remand the case to the trial court for the limited purposes of calculating pre- and post-judgment interest as allowed by law on the award of actual damages to Michael and for entry of judgment consistent with this opinion. Further, we set aside all trial court orders enforcing the Modified Final Judgment and order all money paid into the registry of the court pursuant to those orders, whether as part of the constructive trust or as a cash deposit in lieu of supersedeas bond, be returned to appellants.

---

[16] *See, e.g.*, *Bonsmara Nat. Beef Co., LLC v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 390 (Tex. 2020) ("When a trial court renders a final judgment, the court's interlocutory orders merge into the judgment and may be challenged by appealing that judgment.").

Finally, we dissolve the constructive trust.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

230088F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

MICHAEL COMBS AND
MICHAEL COMBS PROPERTIES,
LLC, Appellants

No. 05-23-00088-CV     V.

DIANE CREPEAU AND LARI
RENINGER, Appellees

On Appeal from the 68th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-19-03038.
Opinion delivered by Justice Partida-
Kipness. Justices Pedersen, III and
Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part.

We **REVERSE** the portions of the Modified Final Judgment that were in favor of appellees DIANE CREPEAU AND LARI RENINGER, including the partial summary judgment that merged into the final judgment, and **RENDER** judgment that appellees DIANE CREPEAU AND LARI RENINGER take nothing on their claims against appellants MICHAEL COMBS AND MICHAEL COMBS PROPERTIES, LLC.

We **RENDER** judgment awarding $30,000 for damages incurred in the past to appellee MICHAEL COMBS on his counterclaim for breach of fiduciary duty against DIANE CREPEAU.

We **REMAND** the case to the trial court for the limited purposes of calculating pre- and post-judgment interest as allowed by law on the award of actual damages to MICHAEL COMBS and for entry of judgment consistent with this Court's opinion.

Further, we **SET ASIDE** all trial court orders enforcing the Modified Final Judgment and **ORDER** all money paid into the registry of the court pursuant to those orders, whether as part of the constructive trust or as a cash deposit in lieu of supersedeas bond, be returned to appellants MICHAEL COMBS AND MICHAEL COMBS PROPERTIES, LLC.

Finally, we **DISSOLVE** the constructive trust imposed by the trial court in the Modified Final Judgment.

It is **FURTHER ORDERED** that appellants MICHAEL COMBS AND MICHAEL COMBS PROPERTIES, LLC recover their costs of this appeal from appellees DIANE CREPEAU AND LARI RENINGER.

Judgment entered this 7th day of October 2024.